**F I L E D**

PUBLISH

**May 17, 2007**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

MARK JORDAN,

Defendant-Appellant.

No. 06-1161

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
(D.C. NO. 04-CR-229-LTB)**

---

Howard A. Pincus, Assistant Federal Public Defender, (Raymond P. Moore, Federal Public Defender, with him on the briefs) Office of the Federal Public Defender, Denver, Colorado, for Defendant-Appellant.

Andrew A. Vogt, Assistant United States Attorney (Troy A. Eid, United States Attorney, David M. Conner, Assistant United States Attorney, Gregory Holloway, Assistant United States Attorney, and John M. Hutchins, Assistant United States Attorney, with him on the brief), Office of the United States Attorney, Denver, Colorado, for Plaintiff-Appellee.

---

Before **McCONNELL**, **BALDOCK**, and **TYMKOVICH**, Circuit Judges.

---

**TYMKOVICH**, Circuit Judge.

---

Mark Jordan was convicted of stabbing to death a fellow inmate in broad daylight at the recreation yard of the federal penitentiary in Florence, Colorado. He claims the district court erred in refusing to admit evidence tending to show the stabbing was committed by another inmate. Jordan also argues the court erred in concluding that multiple armed robberies committed during a 1994 crime spree were unrelated crimes, thus making him eligible for sentencing as a career offender.

Having jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a)(1) and (2), we AFFIRM.

## I. Background

### A. Facts

Mark Jordan was accused of murdering a fellow prisoner at the United States Penitentiary in Florence, Colorado. The crime occurred on the afternoon of June 3, 1999 in the maximum-security prison's recreational yard.

The victim, inmate David Stone, sat at a picnic table in the prison yard wearing only shorts and tennis shoes. Numerous other prisoners were exercising, congregating, and playing games in the outdoor sun. Near Stone were three other inmates, including Mark Jordan and Sean Riker. Both Jordan and Riker were observed walking away from the table. Minutes later, someone stabbed Stone three times. Two of the wounds were superficial, while the third was fatal. Stone was able to run across the yard before collapsing. Later that night he died.

2

Two inmates saw the stabbing. Gary Collins was in the recreational yard at the time of the stabbing. He observed Jordan, oddly dressed considering the heat in a khaki shirt and pants, in the vicinity of Stone. Collins saw Jordan walk behind Stone and stab him in the back. Collins described Jordan's action as "swinging a bat" in Stone's lower back. Vol. XIV, at 338. After Collins watched Jordan make other stabbing motions, Stone "[t]ook off running." *Id*. at 339. He also witnessed Jordan start running after Stone, but Stone was far ahead.

Another inmate, Tyrone Davis, was also in the yard and observed the stabbing. Vol. XV, at 589. He saw Jordan standing by Stone, then watched as Jordan pushed or punched Stone in the back side in an underhanded manner. According to Davis, Stone then started running and Jordan gave chase. He then saw Stone on the ground near a crowd of people, but lost sight of Jordan.

Overlooking the recreational yard is the lieutenant's patio. There, Norvel Meadors, an assistant warden at the prison was taking a cigarette break. While he was smoking, he saw "two inmates sprinting across the yard out on the sidewalk." Vol. XIV, at 207. From his vantage point, Meadors could not identify the inmates, but he noticed one was wearing only shorts and no shirt and the other was in the standard prison attire of a khaki shirt and pants. Meadors immediately recognized that the two inmates were involved in a chase, with the shirtless inmate ahead of the fully clothed one. Over the radio, he ordered a compound officer to direct the inmates to cease their action.

3

Meadors then observed the pursuing inmate stop, while the other one continued running and eventually collapsed to the ground. Meadors saw the inmate in the khaki shirt and pants throw "an object" on top of a housing unit and then sit down at a picnic table. Meadors watched as a compound officer approached this inmate at the picnic table, patted him down, and then took him into custody.

The officer who responded to Meadors's radio call was Benjamin Valle. After Meadors's call, he observed two inmates running, with one about fifteen yards behind the other. Valle watched the trailing inmate stop and then start walking back to a housing unit, throw something up on the roof of the housing unit, and walk over to a bench table and sit down. Valle searched the inmate and then escorted him off the yard. That inmate was Mark Jordan.

Another corrections officer, Fares Finn, Jr., observed the same incidents in nearly identical detail to Valle. A video surveillance camera also captured some of the events that afternoon, among other things (1) four inmates, including Jordan and Stone, sitting at a concrete bench approximately eleven minutes before the stabbing, (2) Jordan approaching where Stone sat immediately before the stabbing, and (3) the subsequent chase between Stone and Jordan. Because of the camera angle, it did not capture the fatal encounter.

After the stabbing, a prison official noticed a spot of blood on Jordan's left arm. Asked about the blood, Jordan claimed it originated from when "[t]hat guy

4

[Stone] ran into me, that's how I got blood on me. I was trying to help him."

Vol. XIV, at 309–10. Later, authorities recovered a bloody, homemade knife or shank about eleven or twelve inches long from the roof of the housing unit. DNA from the shank was determined to belong to Stone. Additional DNA evidence was found on the handle of the knife, but its origin could not be determined. No fingerprints were found on the knife because its handle had been wrapped in cloth.

## B. Procedural History

Five years after the stabbing, Jordan was charged with the murder of Stone and three related offenses.[1] Count One alleged second degree murder, in violation of 18 U.S.C. § 111(a). Count Two charged assault with intent to commit murder, in violation of 18 U.S.C. § 113(a)(1). Count Three accused Jordan of assault with a dangerous weapon, in violation of 18 U.S.C. § 113(a)(1). Count Four asserted assault resulting in serious bodily injury, in violation of 18 U.S.C. § 113(a)(6). On August 9, 2005, a jury found Jordan guilty of all four counts.

A presentencing report recommended Jordan receive a "career offender" enhancement based on multiple prior offenses for armed robbery. The enhancement augmented his total offense level from 33 to 37 and changed his criminal history category from IV to VI. As a career offender, the advisory

---

[1] The record does not disclose the reason for the delay between the crime and the filing of charges.

5

United States Sentencing Guidelines range increased from 188–235 months to 360 months to life. Treating Jordan as a career offender, the district court sentenced him to 420 months on Count One, 240 months on Count Two, 120 months on Counts Three and Four (all to be served concurrently), and supervised release.

## II. Analysis

On appeal, Jordan asserts one claim attacking his conviction and another challenging his sentence. *First*, Jordan claims the district court erred in barring the defense from introducing evidence in support of his theory that an alternate perpetrator, inmate Sean Riker, actually murdered Stone. *Second*, Jordan alleges that the district court erred in finding his 1994 crime spree involved two or more unrelated crimes under the Guidelines §§ 4B1.1(a), 4B1.2(c).

### A.    Alternative Perpetrator

The first issue is whether the district court erred in refusing to admit evidence Jordan claims would implicate another inmate in Stone's murder.

We review a district court's decision to admit alternative perpetrator evidence under an abuse of discretion standard. *United States v. McVeigh*, 153 F.3d 1166, 1188 (10th Cir. 1998). "An abuse of discretion occurs when the district court's decision is arbitrary, capricious, or whimsical, or results in a manifestly unreasonable judgment." *United States v. Weidner*, 437 F.3d 1023, 1042 (10th Cir. 2006). Our deference to the trial court is based upon its first-hand ability to view the witnesses and evidence and assess credibility and

6

probative value. *Id.* Accordingly, the district court's decision to exclude Jordan's alternative perpetrator evidence "will not be disturbed unless the appellate court has a definite and firm conviction that the lower court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances." *Id.*

### 1. Legal Framework

Jordan's theory of defense pits two evidentiary values against each other: (1) the admission of relevant evidence, *Fed. R. Evid. 401*, against (2) the exclusion of prejudicial, misleading, and confusing evidence, *Fed. R. Evid. 403*. The bar for admission under Rule 401 is "very low." *McVeigh*, 153 F.3d at 1190. This is because the degree of materiality and probativity necessary for evidence to be relevant is "minimal" and must only provide a "fact-finder with a basis for making some inference, or chain of inferences." *Id.*

While the burden is low, it does not sanction the carte blanche admission of whatever evidence a defendant would like. The trial judge is the gatekeeper under the Rules of Evidence. Rule 403 requires courts to "exclud[e] [even relevant evidence] if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." *Fed. R. Evid. 403*. Such circumstances might arise when evidence suggests to the jury that it should "render its findings on an improper basis, commonly . . . an emotional one," and when "circumstantial evidence would tend to sidetrack the jury into

7

consideration of factual disputes only tangentially related to the facts at issue in the current case." *McVeigh*, 153 F.3d at 1191 (internal quotes and citations omitted).

When proffered evidence deals with a defense theory of an alternative perpetrator, additional considerations arise. As the Supreme Court recently noted in reviewing the constitutionality of a South Carolina statute that excluded third-party guilt evidence, "[e]vidence tending to show the commission by another person of the crime charged may be introduced by accused when it is inconsistent with, and raises a reasonable doubt of, his own guilt; but frequently matters offered in evidence for this purpose are so remote and lack such connection with the crime that they are excluded." *Holmes v. South Carolina*, 547 U.S. 319, 126 S. Ct. 1727, 1733 (2006) (Third-party guilt evidence may also be excluded "where it does not sufficiently connect the other person to the crime . . . [such as where it is] speculative or remote, or does not tend to prove or disprove a material fact in issue at the defendant's trial.").

Our most recent exploration of the alternative perpetrator evidence was in *United States v. McVeigh*. There, we explained,

> Although there is no doubt that a defendant has a right to attempt to establish his innocence by showing that someone else did the crime, a defendant still must show that his proffered evidence on the alleged alternative perpetrator is *sufficient, on its own or in combination with other evidence in the record, to show a nexus between the crime charged and the asserted "alternative perpetrator."* It is not sufficient for a defendant merely to offer up unsupported speculation that another

8

> person may have done the crime. Such speculative blaming intensifies the grave risk of jury confusion, and it invites the jury to render its findings based on emotion or prejudice.

153 F.3d at 1191 (internal quotes and citations omitted) (emphasis added). Accordingly, courts may properly deny admission of alternative perpetrator evidence that fails to establish, either on its own or in combination with other evidence in the record, a non-speculative "nexus" between the crime charged and the alleged perpetrator.

In *McVeigh*, we upheld the district court's ruling to exclude evidence the defense claimed would link a white-supremacist, anti-government organization to the Oklahoma City bombing. *Id.* at 1188. McVeigh proffered testimony from an undercover agent in the organization that (1) it harbored similar anti-government views to McVeigh's, (2) some members expressed vague threats to bomb targets in Oklahoma, and (3) an alleged identification of the composite sketches released after the bombing. *Id.* at 1192. The district court found the evidence relevant under Rule 401, but excluded it under Rule 403. *Id.* at 1188.

We agreed with the district court's order. First, we held that the proffered testimony's "highly generalized and speculative nature" greatly diminished its probative value. *Id.* at 1191. Second, in light of the lack of a probative nexus between the extremist group and the Oklahoma City bombing, we found that the testimony would lead to the "confusion of the issues" because the government would be forced to put on a "side trial" to disprove the nebulous allegations of the

9

group's involvement in the bombing. *Id.* Third, we concluded the evidence would threaten "unfair prejudice" because "it would invite the jury to blame absent, unrepresented individuals and groups for whom there often may be strong underlying emotional responses." *Id.* at 1192. In balancing relevance and prejudice, we concluded the evidence's low probative value did not outweigh the substantial chance of prejudice and confusion, tipping the scales in favor of exclusion.

With this background, we turn to Jordan's theory of defense.

### 2. Jordan's Alternative Perpetrator Theory

At trial, Jordan did not dispute that (1) he handled the shank that caused the fatal stab wounds to Stone, (2) he was the man Meadors and Valle saw running across the yard, and (3) he threw the murder weapon on the roof. Jordan contended that he did not kill Stone, who had been his cellmate for two months at the United States Penitentiary in Atlanta. Instead, he claimed Sean Riker, who was also at the scene of the stabbing, was the actual assailant. He argues that Riker stabbed Stone and then forced the knife on him. In the confusion, he started running in panic and then threw the knife on the roof.

To establish the required "nexus" to Riker, Jordan pointed to two sources of evidence. The first was evidence that had already been admitted as part of the prosecution's case.

*Admitted Evidence*

10

*First*, both video and testimonial evidence placed Riker at the scene of the stabbing. The video shows Stone, Jordan, Riker and an inmate identified only as "Larry" sitting together at a concrete table several minutes before the stabbing. And Collins testified that he saw Riker and Larry seated at Stone's table prior to the stabbing.

*Second*, Collins claimed to have heard through the prison grapevine, albeit after the stabbing, that Riker had given Jordan the shank to "hit" Stone. Vol. XIV, at 371.

*Finally*, Jordan argues that unidentifiable DNA found on the shank indicates that someone else possessed the shank.

*Proffered Evidence*

The second source of supporting evidence—and the heart of this appeal—are four additional pieces of proffered evidence that Jordan claims would point the finger at Riker.

*First*, Jordan proffered evidence that, six months before the murder, Riker possessed a shank, "almost identical in size and shape" to the shank that killed Stone. Vol. XVI, at 739.

*Second*, Jordan offered statements by Riker to investigators after the stabbing indicating that he was untruthful about the circumstances surrounding Stone's death. Jordan contends that these lies reflect a "consciousness of guilt" on the part of Riker. *Id.* at 734.

11

*Third*, the defense claimed evidence shows that shortly after the stabbing prison officials investigated Riker as a possible suspect in Stone's homicide. *Id.* at 736. The record unfortunately does not disclose the basis for this statement.

*Finally*, Jordan claimed that Riker would testify that he and other inmates went over to a set of bleachers after the stabbing. On the top of the bleachers, investigators later found a blood-stained glove. *Id.* at 737.

\*   \*   \*

Applying the *McVeigh* factors, the district court refused to allow the additional evidence. It concluded that "any probative value [in the evidence] is substantially outweighed by the danger of the prejudice and confusion." Vol XVI, at 744. In particular,

> From this proffer I can't determine that it establishes a probative nexus between Mr. Riker and victim Stone. . . [I]t is [based on]. . ., in essence, negative inference; that is, if Mr. Riker is a liar and if Mr. Riker had had shanks in the past, therefore, Mr. Riker is the perpetrator here. The nexus does not exist under the proffer that you provided.
>
> This is in my view a classic speculative attempt to blame a third person so as to create a grave risk of jury confusion. It invites the jury to render its findings based upon a notion of prejudice.

*Id.* at 744–45. The district court found Jordan's defense theory premised on an impermissible "inference upon inference." *Id.* at 745.

We find no reversible error. The proffered evidence, neither alone nor in combination, suggests the court abused its discretion in applying *McVeigh*'s

12

nexus requirement. As to the proffered evidence, several points bear mentioning. First, it is true that Riker was near Stone a little more than ten minutes prior to the stabbing. But no witness placed Riker near Stone at the time of the stabbing, and two eyewitnesses testified that Jordan committed the crime. Similarly, the unidentified DNA sample on the shank and the blood-stained glove are interesting pieces of unresolved evidence, but no more implicate Riker than anyone else in the prison yard. Riker's possession of a similar shank months before the stabbing again is suggestive, but, ultimately thin in connecting Riker to the actual crime since this evidence (if admissible) sheds little light on what happened in the prison yard the day Stone died. Finally, even Riker consistently took the position in interviews and before the grand jury that Jordan stabbed Stone, according to supplemental exhibits offered by the defense.

Jordan argues the court engaged in "tunnel vision" by failing to put the evidentiary pieces together in a way that plausibly demonstrated Riker could have committed the crime. But the defense, not surprisingly given the substantial direct and circumstantial evidence, has done little more than throw out a series of allegations hoping they would coalesce. Since no witness saw Riker next to Stone at the time of the murder, the alternative perpetrator theory rested primarily on either (1) a long-shot hope that Riker would confess on the witness stand,[2] or

_____

[2] Even if allowed to testify, Riker could have pleaded his right against self-

13

(2) that his lack of credibility would support an inference that he committed the stabbing.

While perhaps a case can be made that the evidence provided some metaphysical showing of motive and opportunity (or more likely conspiracy), the probative value of the evidence must be balanced against the likelihood it "would tend to sidetrack the jury into consideration of factual disputes only tangentially related to the facts at issue." *McVeigh*, 153 F.2d at 1191. Even if the evidence has some minimal relevance when considered as a whole, the district court has the responsibility in weighing the evidence against its misuse—whether by inviting unwarranted speculation or confusion. In applying this balancing, the district court did not abuse its discretion.

Having said that, and while we ultimately find no abuse of discretion, this case highlights many of the difficulties in evaluating alternative perpetrator evidence:

(1) Unlike *McVeigh*, the proffered evidence in this case was more closely connected to the scene of the crime, elevating its probative value. While most of this evidence is of limited value, as a whole it is not nearly as speculative as the proffer in *McVeigh*, 153 F.3d at 1191, or so totally lacking of a "connection with the crime," *Holmes*, 126 S. Ct. at 1733, to be easily disregarded.

---

[2](...continued)
incrimination.

14

(2)  Likewise, on the other side of the evidentiary scale, the risk of "unfair prejudice" and "confusion of the issue" is not as substantial as in *McVeigh*.  First, Riker's proposed testimony (assuming he would take the stand) and the evidence of the shank proffered by Jordan is not complex or time-consuming.  Riker was in the prison yard at the time of the murder and his testimony would be no more confusing than other inmate witnesses.  And unlike *McVeigh* where the group's racist views might provoke the jury's emotions, Riker was only one of many inmates in the yard the day of the stabbing.

(3)  In conducting its Rule 403 balancing, the district court relied on *United States v. Summers*, 414 F.3d 1287, 1295 (10th Cir. 2005), a case in which we found "inferences may become so attenuated from underlying evidence as to cast doubt on the trier of fact's ultimate conclusion."  The district court employed this "inference upon inference" language as instructive in analyzing Jordan's proffer. Vol XVI, at 745.  While any trial theory—defense or prosecutorial—may not rest on cascading inferences, *Summers*'s focus was on the overall *sufficiency* of evidence to convict, and not on its *admissibility*.  Relevant evidence under Rule 401 must only be sufficient to provide a "fact-finder with a basis for making some inference, or chain of inferences."  *McVeigh*, 153 F.3d at 1190; *see also Holmes*, 126 S. Ct. at 1733 (stating that evidence must only be "inconsistent with, and raise[] a reasonable doubt of, his own guilt.").

(4)  The district court's skepticism of Jordan's theory is understandable

15

considering the substantial direct and circumstantial evidence of his guilt.

Nevertheless, the Supreme Court has cautioned us to be wary of per se rules

excluding evidence of third-party guilt merely because "the prosecution's case is

strong enough." *Holmes*, 126 S. Ct. at 1734. The evidence should not be

excluded "if viewed independently, [it] would have great probative value and . . .

if it would not pose an undue risk of harassment, prejudice, or confusion of the

issues." *Id.*

But in the end, the district court's decision to exclude Jordan's evidence

was not an abuse of discretion. In hindsight, we might have evaluated Jordan's

proffer somewhat differently. And the defense could have provided more

substance to the anticipated testimony and admissibility of exhibits.[3]

Nevertheless, the abuse of discretion standard is a deferential one, and the district

court's review of the evidence and its application of that evidence to the *McVeigh*

factors was careful and deliberate.

On this record, we need not second-guess the district court's conclusion,

especially given that the district court's analysis is manifestly based on the case

law and record.

### 3.    Harmless Error

While we conclude the district court did not abuse its discretion in

---

[3] The district court did not foreclose Riker's testimony if an additional foundation could have been laid.

16

excluding the evidence, even if it had done so, the error was plainly harmless. "A harmless error is one that does not have a substantial influence on the outcome of the trial; nor does it leave one in grave doubt as to whether it had such effect." *United States v. Resendiz-Patino*, 420 F.3d 1177, 1181 (10th Cir. 2005) (applying harmless error standard when reviewing district courts' determinations of evidentiary rulings resting solely on the Federal Rules of Evidence).

As the district court concluded in rejecting the proffer, no direct evidence or substantial circumstantial evidence connected Riker with Stone's death while ample evidence linked Jordan to the killing. The prosecution presented evidence showing (1) Jordan at the scene of the crime, (2) two eyewitnesses' accounts of Jordan attacking Stone, (3) Jordan chasing Stone, (4) Jordan discarding the murder weapon, (5) blood on Jordan's arm after the attack,[4] (6) Jordan's own incriminating statements and conduct,[5] and (7) Jordan's motive.[6]

---

[4] Jordan's shifting explanation for the blood also points to his guilt. At first, he claimed, "Oh, that guy [Stone] ran into me, that's how I got blood on me. I was just trying to help him." Vol. XIV, at 309–10. This explanation later morphed into, "I accidentally hit myself in the nose when a person, unknown person bumped into me causing nasal bleeding." Vol. XV, at 643.

[5] While receiving medical attention in the prison medical facility, Jordan was observed making the "V" sign with his hands to another inmate and saying, "Guy, I get him out of your way." Vol XV, at 640.

[6] The prosecution presented evidence that Jordan accumulated several debts owing to other prisoners. The prosecution's theory was that Jordan wanted to get out from under the debts by being placed in a segregated cell or being transferred to another prison. Jordan's case manager testified that Jordan told

(continued...)

17

Moreover, much of Jordan's alternative perpetrator theory banks on already admitted evidence of Riker's presence at the scene of the crime and Collins's statements claiming that Riker gave the shank to Jordan to "hit" Stone. Accordingly, most of the pieces in the alternate perpetrator puzzle were already in evidence. Based on the admitted evidence, Jordan's defense ably argued that someone other than Jordan committed the stabbing. In closing arguments, Jordan's defense counsel raised the specter that Riker committed the stabbing.

> [W]hat could reasonable doubt be based on? It could be based on the evidence that is presented to you or the lack of evidence.
>
> Let's talk about that.
>
> Where is Sean Riker? Why haven't [government authorities] brought him in? Mr. Collins says Sean Riker was at the table at the time of the stabbing.
>
> Mr. Collins says in one of his statements that Mr. Riker actually provided the weapon.
>
> I wonder whose DNA is on that handle? Any guess?

Vol. XVII, at 953-954.

Jordan's defense counsel then goes further to implicate Mr. Riker in the

---

[6](...continued)
him that he wanted "to get off this mountain," Vol. XV, at 629, and stated that he would have to "hurt someone" to get into another institution, *id*. at 629–631. The prosecution also introduced into the record a letter Jordan wrote to his mother discussing his desire to be placed in segregation. *Id*. at 560–61. Additionally, in closing, the prosecution argued Jordan chose Stone as his victim to project the image that he is not to be "messed with" since he killed his former cellmate. Vol. XVII, at 975–76.

crime.

> We don't have the abilities [government authorities] have. We can't go listen to phone calls that are made by Mr. Riker or some inmate by the name of Larry or Mr. Collins to see if he has been calling anybody about this. We don't have the ability to search their cells. We don't have the ability to search DNA databases to see if Mr. Riker or other people's DNA is on the weapon.

*Id.* at 959.

Jordan's defense counsel also had the opportunity to raise all the "[o]ther evidence that points towards [Jordan's] innocence." *Id.* at 957. "Other inmates are in the bleachers, the glove underneath the bleachers. . . . Someone else's DNA [is] on the shank handle." *Id.* Additionally, "[T]here are several people that are there, that have the opportunity and the ability to do the stabbing." *Id.* at 954.

Accordingly, the district court's preclusion of the proffer did not prevent Jordan from offering an alternative perpetrator defense. Instead, the jury chose to disbelieve the theory. As we discussed above, several good reasons support the jury's conclusion. The crime took place in the midst of a busy, warm day in the prison's recreation yard. According to Meadors, a couple hundred prisoners were in the vicinity; Valle testified that some forty prisoners were in the area. No one claimed to see Riker assault Stone, while two observed Jordan attack Stone.

In the face of this evidence, the addition of circumstantial evidence regarding Riker would not have had a substantial influence on the outcome of the trial. Accordingly, even assuming the evidence should have been admitted, its

19

omission was harmless.

**B.     Sentencing as Career Offender**

Jordan also claims the district court erred in failing to group together his thirteen prior convictions for armed robbery. Under the Guidelines § 4A1.2(a)(2), the court's finding that the crimes were not related meant he was eligible to be sentenced to life under the Guidelines' career offender enhancement.

**1.     Standard of Review**

We review the district court's factual determinations under the advisory Guidelines using a clearly erroneous standard. *United States v. Kristl*, 437 F.3d 1050, 1053 (10th Cir. 2006). Nevertheless, "[t]he meaning of the word 'related' is a legal issue that we review de novo." *United States v. Gary,* 999 F.2d 474, 479 (10th Cir. 1993). Once the government has established the existence of two qualifying prior convictions, the burden shifts to the defendant to demonstrate that his prior offenses were "related" to a common scheme or plan under the Guidelines. *See United States v. Alberty*, 40 F.3d 1132, 1134 (10th Cir. 1994).

**2.     Career Offender Enhancement**

Jordan's prior offenses stem from a criminal spree in the Philadelphia, Pennsylvania area occurring between August 20 and September 13, 1994. He was convicted of a cluster of ten state robbery and related charges in the Philadelphia Court of Common Pleas and a cluster of three federal armed bank robbery and related charges in the U.S. District Court for the Eastern District of Pennsylvania.

Jordan contends these prior offenses were part of a "related," "single common scheme or plan," making him ineligible for sentencing as a career offender.

Prior felony convictions for a crime of violence or a controlled-substance offense whose sentences "are counted separately under the provisions of § 4A1.1(a), (b), or (c)" may be used for a "career offender" enhancement under the Guidelines. USSG § 4B1.2(c)(2). "Prior sentences imposed in unrelated cases are to be counted separately." *Id.* at § 4A1.2(a)(2). But "prior sentences imposed in related cases are to be treated as one sentence for purposes of § 4A1.1(a), (b), and (c)." *Id.* To determine whether prior sentences are related, application note 3 to § 4A1.2 instructs:

> Prior sentences are not considered related if they were for offenses that were separated by an intervening arrest (i.e., the defendant is arrested for the first offense prior to committing the second offense). Otherwise, prior sentences are considered related if they resulted from offenses that (A) occurred on the same occasion, (B) *were part of a single common scheme or plan*, or (C) were consolidated for trial or sentencing.

*Id.* at § 4A1.2, comment. (n.3) (emphasis added).

It is undisputed that Jordan's prior offenses for armed robbery were not separated by an intervening arrest, and Jordan does not contend that the offenses occurred on the same occasion or were consolidated for trial or sentencing. Instead, he argues that the offenses are related because they "were part of a single common scheme or plan."

21

### 3. Common Scheme or Plan

The proper inquiry in considering whether prior convictions arose from a "single common scheme or plan" focuses on "factual commonality." *United States v. Wiseman*, 172 F.3d 1196, 1219 (10th Cir. 1999) (quoting *United States v. Shewmaker*, 936 F.2d 1124, 1129 (10th Cir. 1991)). In *Shewmaker*, we found that "[f]actors such as temporal and geographical proximity as well as common victims and a common criminal investigation are dispositive" on the question of "factual commonality." 936 F.2d at 1129.

Jordan claims his 1994 crime spree was "rife with factual commonalities" and thus are related as a "single common scheme or plan." Aplt. Br. at 21. Jordan relies on the district court's finding that the state and federal charges were similar. At sentencing, the district court stated, "[a]s a matter of fact," the robberies "were committed over a short period of time, . . . in close geographical proximity[,] [a]lthough not identical perhaps, the modus operandi was similar. The motive I will accept as one of supporting a drug addiction." Vol. XIX, at 87.

In discussing *Shewmaker,* the district court suggested Jordan might have met his burden of proving relatedness.

> [*Shewmaker*] focused on commonality factors such as temporal and geographic proximity, as well as common victims in a common criminal investigation. It says that these factors are dispositive. Use of the word dispositive in that opinion could end the analysis at that point because [it] merely focus[ed] on factors of commonality and nothing else.

*Id*. at 84–85.

22

Nevertheless, the district court did not stop there. Instead, it surveyed the decisions of other circuit courts to give fuller context to the factors described in *Shewmaker*. The court looked primarily to the Fifth Circuit's opinion in *United States v. Robinson,* where the court held that "the words 'scheme' and 'plan' are 'words of intention, implying that the [prior offenses] have been jointly planned, or at least that it have been evident that the commission of one would entail the commission of the other as well.'" 187 F.3d 516, 520 (5th Cir. 1999) (quoting *United States v. Ali*, 951 F.2d 827, 828 (7th Cir. 1992)).

As the district court went on to note, the Third, Sixth, and Seventh Circuits employ a similar analysis. *See, e.g., United States v. Beckett,* 208 F.3d 140, 147 (3d Cir. 2000) (quoting *Ali*); *United States v. Irons,* 196 F.3d 634, 639 (6th Cir. 1999) ("Forming the same intent at two distinct times . . . does not evidence joint planning. Rather, defendant must show that he either intended from the outset to commit both crimes or that he intended to commit one crime which, by necessity, involved the commission of a second crime."); *United States v. Brown*, 209 F.3d 1020, 1024–25 (7th Cir. 2000) (holding that defendant must show he either (1) "jointly planned" the robberies, i.e., intended to commit the robberies "from the outset," or (2) intended to commit one of the robberies which necessarily involved committing the others).

Applying a broader interpretation of *Shewmaker*, the district court determined that the "common scheme or plan" inquiry properly included

23

consideration of the defendant's intent in the commission of the prior offenses. We agree. A close reading of *Shewmaker* reveals that it did not intend the "factual commonality" test to be limited exclusively to the four factors mentioned in the opinion. *Shewmaker*'s use of "[f]actors such as" obviously connotes that its list of four factors is a non-exclusive set. In our view, the "factual commonality" test articulated in *Shewmaker* does not preclude the consideration of other factors, such as intent and planning, in determining factual commonality.

Our interpretation is consistent with a subsequent interpretation of *Shewmaker*. In *United States v. Wiseman*, for example, we applied *Shewmaker's* "factual commonality" test in the context of escape and robbery offenses. We found no common scheme where the "defendant has not even alleged that when he fled the prison in Idaho he was already planning a series of grocery store robberies in several states. To the contrary, in his confession defendant related forming the idea with [a companion] some time after the escape." 172 F.3d at 1219. It is obvious that consideration of the defendant's formation of the idea or the intent to commit multiple offenses bears on their relatedness.

We thus agree with the district court's application of the career offender enhancement. Several factors support this conclusion. Jordan planned and executed thirteen crimes over a five-week period. While Jordan may have employed common techniques and similar targets (i.e., banks and small businesses), the federal and state charges are distinct. Each victim was a separate

24

target that took individualized intent, planning, and execution to rob. No linkage exists between the crimes; one robbery was not a prelude to another.

Jordan argues geographical proximity created a common scheme or plan, but fails to suggest why that factor is particularly important in evaluating his crimes. Although the robberies were committed in a single large city (Philadelphia), that alone is a minor element in evaluating relatedness without a further showing of how each crime relates to the other. Indeed, each crime was independently conceived and implemented. The crimes were committed on separate days in different parts of the city, hardly a joint operation.

Finally, we disagree with his claim that each crime's common motive—supporting his drug habit—is a weighty factor showing relatedness. His desire for money motivated the crimes, but a financial motive—even to fuel a drug habit—adds little to the analysis. If it did, every crime, no matter what the intervening circumstances might be related under some variation of this theory. *Shewmaker* does not compel such a wooden interpretation of factual commonality. Rather, the sentencing court should look at all of the facts and circumstances indicating whether the offenses were jointly planned. That primarily fact-based question will then guide its application of the sentencing enhancement.

Accordingly, based on all of the facts and circumstances in this case the district court did not err in finding two unrelated crimes supported Jordan's career offender enhancement.

25

### III. Conclusion

For the foregoing reasons, we AFFIRM Jordan's conviction and sentence.