FILED
United States Court of Appeals
Tenth Circuit

November 14, 2017

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

STEVEN J. MEISEL,

Defendant - Appellant.

No. 15-3182

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
(D.C. NO. 6:14-CR-10106-JTM-1)**

---

Daniel T. Hansmeier, Appellate Chief (Melody Brannon, Federal Public Defender, with him on the briefs), Kansas Federal Public Defender, Kansas City, Kansas, for Defendant-Appellant.

Jason W. Hart, Assistant United States Attorney (Barry R. Grissom, United States Attorney, with him on the brief), District of Kansas, Wichita, Kansas, for Plaintiff-Appellee.

---

Before **TYMKOVICH,** Chief Judge, **BRISCOE**, and **MURPHY**, Circuit Judges.

---

**MURPHY**, Circuit Judge.

---

# I. INTRODUCTION

A jury found Steven Meisel guilty of distributing and possessing child pornography. *See* 18 U.S.C. § 2252(a)(2), (a)(4)(B). Meisel asserts the district court (1) violated his right to present a complete defense by preventing him from adducing alternative perpetrator evidence[1]; and (2) erred in denying his request to instruct the jury on "identity." Even assuming the district court erred in limiting Meisel's ability to present alternative perpetrator evidence, any such error was harmless. And, since the jury instructions, considered as a whole, adequately conveyed to the jury the gist of Meisel's defense, the district court did not abuse its discretion in refusing to give Meisel's proffered instruction. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, this court **affirms** Meisel's convictions.

# II. BACKGROUND

## A. The Criminal Investigation

On May 9, 2014, Detective Jennifer Wright saw a user on the Ares file-sharing network[2] offering child pornography. After downloading five videos, she captured the IP address, the user's Ares nickname, and the user's version of Ares.

---

[1]*See Holmes v. South Carolina*, 547 U.S. 319, 321, 330-31 (2006) (holding unconstitutional a state evidentiary rule automatically excluding alternative perpetrator evidence when the prosecution case was strong).

[2]"Consistent with other file-sharing programs, Ares permits users to download and view files stored on other users' computers in their shared folders." *United States v. Abbring*, 788 F.3d 565, 566 (6th Cir. 2015). For a description of how peer-to-peer file sharing programs operate, see generally *MGM Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 919-23 (2005).

Based on the captured IP address, she obtained a search warrant for a home Meisel shared with Linda Thomas. When the warrant was executed, officers found two computers: Thomas's and Meisel's. Meisel's computer, which had a picture of a unicorn on the cover, was connected to an external hard drive.

Officers interviewed Thomas during execution of the warrant. She said (1) Meisel moved in with her three years earlier, in the fall of 2011; (2) W.R., Meisel's son, lived with them for one year, but had been gone from the residence for one year; and (3) she previously shared Meisel's computer. Thomas bought her own computer approximately one year earlier, after she discovered child pornography on Meisel's computer. She immediately confronted Meisel about the child pornography and, in response, Meisel blamed W.R. At that point, Meisel insisted Thomas obtain her own computer. Thereafter, according to Thomas, Meisel "was the only one that was ever on there because he wouldn't let anybody use his computer."[3] Thomas said that when Meisel had friends over, they had to bring their own computers to access the internet.

During his interview with officers, Meisel acknowledged owning the computer and external drive and said he did not share his password with anyone. He identified his user profile as "Unicorn" and provided the password. This was

---

[3]The time line in Thomas's statement was corroborated at trial by evidence the last password change on Meisel's computer occurred roughly a year before the execution of the search warrant.

the only profile on the computer associated with child pornography.[4]  Despite being aware of the purpose of the interview, it took Meisel some time before he told officers he previously found, in a folder titled "Test," child pornography sites and pictures.  Officers did find a "Test" folder on the external hard drive.  That "Test" folder turned out to be the exact location child pornography was stored, some having been added just three days prior to the execution of the warrant.  Meisel attributed the "Test" folder and child porn to W.R.[5]

In contrast to Thomas's statement, Meisel said he was the one who first found the child pornography on his computer.  He claimed he opened one picture and deleted the rest based on the titles.[6]  He admitted using Ares, stating his Ares

---

[4]"A user profile is a prevalent software operating tool that allows a user to access a personal desktop set-up, folders, files, and software programs.  When a user profile is password protected, its desktop set-up and files cannot be readily accessed by others who do not know the password."  *United States v. Grzybowicz*, 747 F.3d 1296, 1300 n.1 (11th Cir. 2014).

[5]The prosecution asserted at trial that Meisel's reference to a "Test" folder was a clear indication of his awareness of the child pornography found in the "Test" folder on the external hard drive.  In an attempt to explain his interview reference, Meisel testified it was to an entirely different "Test" folder, this one supposedly located on the computer's internal hard drive.  That is, he asserted the child pornography identified by Thomas was located on the computer itself, not the external hard drive, and he deleted that material after its discovery.  Meisel's testimony in this regard was not supported by any forensic evidence.  Instead, the undisputed forensic evidence indicated there was no such folder on Meisel's computer and, if such a folder had ever existed, it could not be recovered.

[6]As to the "Test" folder on the external hard drive, a forensic examination showed contraband located therein predated W.R.'s arrival and other contraband was added after his departure.  The forensic examination indicated no "Test"

(continued...)

-4-

nickname of "Uni1" was consistent with his user profile name and his love of unicorns. He claimed he left the Ares settings to "default," but later described changing them to direct files to particular locations. He said the external hard drive, which he purchased at a yard sale three years earlier, was always connected to the computer. When asked about organization of the external hard drive, he claimed he had not "sorted through [it] for I'd say a year or so." Challenged about the more recent activity after W.R. was gone, Meisel stated: "If it's on there, and it's recent, then it had to have been me." He repeated, "If you found it on there, evidently it's on there somehow, nobody else used it, I guess I put it there . . . . If it's in there, I must have put it in there somehow."

Officers conducted a forensic examination of Meisel's computer. Meisel purchased the computer on September 14, 2011. Regarding login information for the "Unicorn" user profile, the laptop recorded 3249 successful logins prior to June 13, 2014, equating to roughly 3 logins (and, thus, logouts) per day. The Ares client was installed the same day Meisel purchased the computer. The Ares version (2.1.6.3040) and user-nickname ("UNI1") matched those captured by Wright when she originally saw a user on the Ares file-sharing network offering child pornography. The videos downloaded by Wright during the investigation were present on the external hard drive under the "Test" folder.

---

[6](...continued)
folder existed on the computer's internal hard drive.

The external hard drive had been intentionally assigned the specific drive letter "H." Meisel's Ares client was set to share from (and only from) the "Test" folder and its subfolders on the "H" external drive. These folders were organized according to content (i.e., "pics" contained still images, "videos" contained only videos, and "text" contained "literature"). Under the "videos" folder, the files were further organized according to content (e.g., "beast" for bestiality, "mas" for masturbation, "orl" for oral sex, "ful" for intercourse, etc.). The Ares client also identified that only videos, images, and documents were being shared, not music or software. Similar to the sharing feature, Meisel's Ares client was set to download only to the "Test" folder on the external drive. Thus, both the external hard drive and the sharing/downloading features of Ares had been specially set to the "H" drive, regardless of other available drive letters.

Only nine videos downloaded to the "Test" folder had not yet been sorted into subcategory folders. Almost all had been downloaded recently, except for one titled "suicide." The "Test" folder and its subfolders had been specifically set to show "large" previews of the contents, such that any user would immediately see the actual contents rather than an icon. Child pornography from the external hard drive was frequently viewed on Meisel's computer via the Windows Media player. Windows Explorer showed the "Test" folder, and its descriptively-named subfolders, had been recently and frequently accessed, to the exclusion of any other folder. Likewise, both Wordpad and Adobe Reader

-6-

indicated sexualized literature involving children was recently accessed via Meisel's computer. Recent search terms in the Ares client revealed terms associated with child pornography. Finally, the forensic examination revealed that all remotely recent activity on the "H" drive had taken place in the "Test" folder (i.e., the very location on the hard drive that contained child pornography).

**B. Pre-Trial Proceedings**

A grand jury indicted Meisel on a charge of distributing five specific videos of child pornography on May 9, 2014 (i.e., the day Detective Wright initiated her investigation), in violation of 18 U.S.C. § 2252(a)(2), and a charge of possessing child pornography on June 13, 2014 (i.e., the day the warrant was executed), in violation of 18 U.S.C. § 2252(a)(4)(B). Meisel indicated he intended to introduce at trial evidence other individuals were responsible for the child pornography on his external hard drive. The government responded by filing a motion in limine to exclude such evidence. Relying on *Holmes v. South Carolina*, 547 U.S. 319, 327 (2006), the government noted it was widely accepted that evidence tending to prove another person may have committed the charged crime may be excluded if it is "speculative or remote, or does not tend to prove or disprove a material fact in issue at the defendant's trial." Furthermore, according to the government, Meisel had proffered no evidence of a legally sufficient nexus between any individual and his computer, his external hard drive, his Ares profile, or any child pornography found on his computer or external hard drive. Thus, the

government asserted the district court should not allow Meisel to argue another individual was the actual perpetrator.

Meisel filed a response and a proffer. He denied downloading the child pornography found on his external hard drive or knowing of its existence. He asserted the sole fact issue to be resolved by the jury was: "[W]ho—what person or persons—sat at the lap top computer and used it to access child pornography from the external hard drive? Who possessed—knowingly and intentionally—the child pornography on the external hard drive?" He asserted a sufficient nexus existed between three individuals—J.H., S.H., and W.R.—and the child pornography on the external hard drive. He thereafter proffered evidence in support of his proposed alternate-perpetrator defense.

**J.H.**

Meisel asserted J.H. had "unfettered access" to the computer and external hard drive at times Meisel was absent from the home. He further asserted: J.H., Thomas's caregiver, was at the home at least three hours a day, four days a week; J.H. had a key to the home; and, due to her physical condition and medications, Thomas "sleeps a great deal," specifically including times J.H. was present in the home. As to J.H.'s nexus to Meisel's computer, Meisel asserted: the computer was "logged in and turned on" at times J.H., but not Meisel, was at the home; J.H. used the computer on June 10, 2014, between 5:39 p.m. and 6:13 p.m. and child pornography was downloaded that same day from Ares at 2:21 p.m., 2:56 p.m.,

4:00 p.m., 4:31 p.m., and 6:40 p.m.; and J.H. lived with Meisel at a prior residence and Meisel owned the computer at that time as well. Finally, Meisel proffered that he was introduced to Ares by J.H. and J.H. had "a high level of technical knowledge about the operation of the Ares program."[7]

**S.H.**

According to Meisel, S.H., J.H.'s brother, would visit the home when Thomas was asleep, Meisel was not present, and the computer was on and accessible to others. Meisel also asserted S.H. knew the Wi-Fi password. Finally, Meisel noted S.H. had lived in the home, although the proffer does not indicate whether that was before or after Meisel moved into the home.

**W.R.**

Meisel proffered that his son, W.R., lived in the home for a brief period, had regular access to the computer, and knew the Wi-Fi and computer passwords. Meisel also asserted as follows: "[Meisel] found that [W.R.] had accessed two child pornography sites on his computer. [W.R.] had regular access to the

---

[7]In an effort to meet the nexus requirement set out in *Holmes*, 547 U.S. at 327, Meisel proffered that J.H. had engaged in a type of sexual misconduct that made it more likely he was the individual associated with the child pornography found on Meisel's computer. *See United States v. Montelongo*, 420 F.3d 1169, 1174 (10th Cir. 2005) (noting this type of evidence "is often referred to as 'reverse 404(b)' evidence"). The district court excluded this evidence as both irrelevant and unduly prejudicial. Meisel specifically disclaims any appellate challenge to the district court's treatment of reverse 404(b) evidence. That being the case, this court does not consider any reverse 404(b) evidence in deciding this appeal.

computer and [Thomas's] granddaughter saw [W.R.] using [Meisel's] computer when [W.R.] had been told by [Meisel] not to do so."

After a hearing on the government's in-limine motion,[8] the district court determined Meisel had not proffered sufficient evidence to establish the necessary nexus between any of the proposed alternate perpetrators and the crimes with which Meisel was charged. As to W.R., the district court outlined Meisel's argument and evidence, quoting from his pleadings. The district court noted that "[d]uring the in limine hearing, [Meisel] admitted that no one ever saw [W.R.] accessing child pornography on [Meisel's] computer." Thus, the district court concluded, "[t]here simply is no evidence to sufficiently establish a nexus between [W.R.'s] use of the computer and the crimes charged." As to S.H., the district court concluded no evidence connected S.H. to the computer and S.H.'s mere presence in the home where the computer was located was not sufficient to

_____

[8]At the hearing, Meisel conceded the nexus evidence as to S.H. was weak:

[T]he second individual is a little more tenuous, and that's [S.H.]. . . .

        The connection with [S.H.] is . . . he lived in the house for a short period of time and would come over to the house and because the computer—Mr. Meisel would leave the computer up and running, and anybody could go in and use it, the evidence that we have there is—and the nexus evidence that we have there is that he was in the house and, therefore, had access to the computer.

        We, aside from that, we don't have any evidence, direct evidence linking [S.H.] to the computer. . . .

-10-

meet the test set out in *Holmes*. The district court described the evidence as to

J.H. as "[Meisel's] most substantial showing," but concluded even that evidence

was "tenuous at best." Though it assumed all facts as proffered by Meisel were

true, the district court observed Meisel "attempted to link, by inference" J.H.'s

lawful activity (shopping on the Amazon.com website), of which Meisel was

aware, with secret illegal activity occurring at other times. In rejecting such

"unsupported speculation," the district court observed as follows:

> During the *in limine* hearing, [Meisel] attempted to link, by
> inference, the fact that because [J.H.] admitted to being on the
> computer from 5:39pm–6:13pm using the website Amazon.com, he
> therefore must *also* have been the user that accessed and downloaded
> child pornography in the times prior to and after that Amazon.com
> search. However, . . . "a defendant still must show that his proffered
> evidence on the alleged perpetrator is sufficient . . . to show a nexus
> between the crime charged and the asserted 'alternative perpetrator.'
> *It is not sufficient* for a defendant merely to offer up unsupported
> speculation that another person may have done the crime." [*United
> States v. McVeigh*, 153 F.3d 1166, 1191 (10th Cir. 1998) (emphasis
> added).]

> Here, [Meisel's] allegation that because [J.H.] used the
> computer for a lawful purpose between two times in which the
> computer was used to download child pornography, it *must* also be
> that [J.H.] was also the person responsible for accessing and
> downloading the child pornography. This notion is merely
> "unsupported speculation" and lacks a sufficient nexus to link [J.H.]
> to the crime charged. Furthermore, the evidence suggests that
> [Meisel] was present and monitoring [J.H.'s] use of the computer
> during this time.

The district court made clear its ruling did not prevent Meisel from arguing

others (generally) had access or opportunity to access the computer and/or hard

-11-

drive.  That is, Meisel could adduce evidence that others had access to his

computer and/or hard drive to counter the government's theory that Meisel was

responsible for the child pornography because he had exclusive use of the

computer.  What Meisel could not argue, however, was that either W.R., S.H., or

J.H. was the perpetrator based on the mere fact he had some level of proximity to

the computer or hard drive.  Immediately prior to the start of trial, the district

court again made this point clear, ruling as follows:

> [T]here is absolutely nothing wrong with bringing out during the
> course of the evidence, or even during your opening statements,
> assuming you have the evidence, that there were various people in
> and out of the house that had access to the computer but what I am
> not going to let you do is to argue that [W.R.], you know, there is
> reason to believe that he downloaded it.
>
> So, I mean, facts are facts and I'll let you bring out any facts
> that you want to, it's the inferences and the arguments from it so . . .
> if [W.R.] ends up on the stand, you can ask him, you know, about
> that or if [Meisel] testifies, as you indicated he was going to, you can
> ask him about who he knows had access.
>
> What I am not going to let you do is to argue to the jury that
> that's evidence that they downloaded it.

## C.  The Trial

### 1.  Meisel's Opening Statement

During his opening statement, Meisel did not contest the presence of child

pornography on his external hard drive, but asserted he was not responsible for its

presence on his computer.  In that regard, he noted some of the child pornography

was placed on the hard drive approximately a year before he purchased the laptop

computer.[9]  He further asserted that although the computer was password

protected, it was often left running.  In such situations, Meisel claimed anybody

could access the computer.  Furthermore, according to Meisel, numerous people

passed through the residence while he was absent and some of those people had

access to the computer.  Finally, Meisel asserted his busy schedule as a volunteer

meant he spent much time away from the residence he shared with Thomas.

## 2.  The Government's Case

The government called four witnesses, three law enforcement officers and

Thomas, presenting a powerful (particularly forensic) case for Meisel's guilt.

Detective Wright testified she connected to the Ares network on May 9,

2014, and used special software to connect to a computer with hundreds of files

of suspected child pornography.[10]  The username associated with the computer

---

[9]To be clear, the parties at trial vigorously contested the date Meisel purchased the external hard drive.  Citing Meisel's statements during his interview with officers, the government contended Meisel owned the external hard drive before he bought the computer at issue in this case and asked the jury to infer Meisel placed the child pornography on the external hard drive via his previous computer.  Meisel, on the other hand, testified he purchased the external hard drive shortly after he bought the computer at issue here.

[10]Wright testified she would not have been able to observe the suspect files unless the user was on "the internet with the [Ares] program running."  She made clear on cross-examination, however, that the user did not have to be sitting at the computer for the computer to make files available to other members of the Ares network.  Instead, all that was necessary was the user's computer was running and connected to the internet.  Importantly, however, the computer forensic examiner testified the Ares program on Meisel's computer was not configured to start automatically when the user signed on to the computer.  Accordingly, for files to
(continued...)

-13-

was "UNI1."  Wright obtained the computer's IP address, leading to a search warrant for Meisel's residence.  Officers executed the search warrant on June 13, 2014.  They seized Meisel's laptop computer, which had a picture of a unicorn on it.[11]  The laptop was attached to an external hard drive.  Wright conducted a forensic preview of Meisel's laptop.  That preview verified the presence of child pornography on Meisel's computer.

Thomas testified Meisel lived with her for about three years.  W.R. lived with them for one year, but had been gone from the residence for about one year before the execution of the warrant.  She had shared Meisel's computer, but bought her own computer after discovering, about one year before the events in question, child pornography on Meisel's computer.  Meisel blamed W.R. for the presence of child pornography.  Thereafter, according to Thomas, Meisel "was the only one that was ever on there because he wouldn't let anybody use his

---

[10](...continued)
be shared from Meisel's computer, the user would have to manually turn on file sharing each time the computer was logged on.

[11]As to this laptop computer, the parties presented the following stipulation to the jury: (1) "[Meisel] purchased his laptop from Hometown Rent-to-Own.";
(2) "The laptop was purchased September 14, 2011 and it was a used laptop at the time it was purchased by [Meisel]."; and (3) "The reference on his computer to . . . HT . . . refers to Hometown and reflects that Hometown purchased the computer new and later set up operating systems on the computer under the account name . . . HT . . . ."

computer."[12]  On cross-examination, Thomas testified she slept during the day about three times a week; there were frequent and regular visitors to the home she shared with Meisel, including at least one of Thomas's caretakers, J.H., who had a key to the residence; and Meisel was usually away from the home during the day doing volunteer work.[13]  On redirect, Thomas testified she had never seen

_____

[12]When asked to provide examples of this restriction, Thomas testified as follows:

     A.  Well, like, his son wanted to get on it and he wouldn't let him.  He has had people over at the house ask if they could get on it for a minute to just check their e-mail or something, and he wouldn't let them.

     Q.  Would you ever have other individuals that would come over to the house and bring their own computer?

     A.  Yes.

     Q.  And why would they bring their own computer?

     A.  Because they wanted to be able to get on the internet and, you know, they knew he wouldn't let them use his.

     Q.  All right.  So these are folks using the internet but not using his computer?

     A.  Right.

[13]When asked whether she observed "inappropriate behavior by [Meisel] toward young children" during the time they lived together, Thomas testified:

     A.  Well, he—any time he seen a child he went up to them.  He would do magic tricks to get their attention or he would just, uh, talk to them and stuff and I didn't think anything of it at the time, I just thought, you know, he liked little kids, but he was always attracted to

(continued...)

-15-

anybody else using Meisel's computer to look at child pornography and had never awakened to find somebody using Meisel's computer.

Detective Kimberly Kleinsorge testified as to her interview with Meisel during the execution of the search warrant. After Kleinsorge authenticated a recording and transcript of her interview with Meisel, the recording of the interview was played for the jury. Portions of the interview are set out above. *See supra* at 3-5. To summarize the most salient points, Meisel admitted using Ares, stated his Ares identifier "UNI1" was consistent with his computer user profile and his love of unicorns, and stated as follows about the presence of child pornography on his computer: "If it's on there, and it's recent, then it had to have been me." Kleinsorge testified she conducted a forensic examination of Thomas's computer and additional electronic devices found in Thomas's residence. Nothing relating to Ares or child pornography was found on any of those devices. There

---

[13](...continued)
little kids.

Q. And my question is, again, did you ever observe anything inappropriate by [Meisel]?

A. No, I did not.

Q. And while you lived with [Meisel] at the house did you ever see him, [Meisel], looking at child pornography on the computer?

A. I didn't see him do it.

-16-

was no evidence of the use of "cleaner" or "erasing" programs as to Thomas's personal computer or other electronic devices found in Thomas's home.

Forensic examiner Michael Randolph testified as to his examination of Meisel's laptop computer. Highlights of that testimony are set out above. *See supra* at 5-7. It is, however, worth emphasizing aspects of Randolph's testimony. Randolph testified via a "virtual tour" of Meisel's computer.[14] Randolph testified that of the three user profiles on Meisel's computer, "Open," "Linda," and "Unicorn," only Meisel's Unicorn profile contained child pornography. Within Meisel's user profile, Windows Media Player was one of the most commonly used programs. Upon opening Windows Media Player, the user was presented with a "list of the most recently opened files with this program." Video files on that list "contain[ed] names that appear to be child pornography related." Randolph testified nine videos recently watched in Windows Media Player involved suspected child pornography and seven of the nine suspected videos were found on the external hard drive.[15] Likewise, the list of most recently opened files

_____

[14]That is, as he testified, Randolph showed the jury relevant aspects of Meisel's computer on a video screen in the courtroom. For example, Randolph could, inter alia, open the Windows Media Player and the jury could see for itself that many of the recently watched videos involved child pornography and the majority of those recently viewed videos were located on the external hard drive. Thus, as to each important aspect of the forensic examination, the jury was able to observe the actual set up and operation of Meisel's computer and external hard drive. That virtual tour is part of the record on appeal.

[15]Windows Media Player was not the only program on Meisel's computer
(continued...)

-17-

associated with the WordPad[16] program included material relating to "incest, erotic preteen girls, [and] kiddie porn."

Randolph next testified about the Ares file-sharing program installed on Meisel's computer. He noted Ares, with a username "UNI1," was installed on the computer the same day Meisel purchased the laptop. Notably, the Ares program on Meisel's computer was customized (i.e., not set to run with default settings). Instead, Ares was disabled from running automatically, downloads from Ares were programmed to save in the "Test" folder on the external hard drive, and Ares was programmed to share files only from the "Test" folder. The UNI1 Ares profile had been used to search for files with terms associated with child pornography. Files on the external hard drive that were manually set to be available for sharing were descriptively titled in a way that made clear they were child pornography. Thousands of images and over three hundred videos were available to be shared from Meisel's Ares profile, most with child-pornography-related names and content. Notably, the "Test" folder and its subfolders had been

_____

[15](...continued)
used to watch videos. For instance, Randolph also displayed for the jury Meisel's "DIVX player." Unlike Windows Media Player, which likely came bundled as part of the computer's operating system, the DIVX player was specifically downloaded onto Meisel's computer. As was true of Windows Medial Player, the list of recently opened files in the DIVX player contained names consistent with child pornography. Some of those files were on the external hard drive.

[16]Randolph testified that WordPad is a "Windows default program . . . which is used to create and read and open text files."

set by the user to show "large" previews of the contents, such that an individual even casually reviewing the contents of the "Test" folder would immediately see the presence of child pornography.[17]  The Ares program had been used as recently as June 11, 2014, two days before the execution of the warrant.

On cross-examination, Randolph agreed his examination revealed numerous external devices had, at some undetermined time, been plugged into Meisel's computer, including an RCA MP3 device labeled "LINDA'S MP3," and flash drives labeled "[W.R.'s]" and "[J.H.'s]."  Forensic evidence also established some of the suspected child pornography found on the external hard drive originated from a computer different from Meisel's computer.  Moreover, most of the pornographic videos originated from "built-in administrator[]" accounts, including two video files created on the afternoon of June 10, 2014.

### 3.  The Defense Case

J.H. was Meisel's first witness.  J.H. was Thomas's caregiver and, in that capacity, had a key to the house Thomas shared with Meisel.  J.H. testified that during his time working for Thomas, numerous people were guests at the house and confirmed Meisel would, "at times," leave his computer running with a

---

[17]Meisel specifically stated during his interview with Kleinsorge that he "went on" the Ares program "a couple of weeks" before the execution of the warrant.  Randolph's forensic examination verified there was activity on both the computer and external hard drive in the weeks before the warrant execution and that "all the activity on the external hard drive was within [the] test folder."

"slots" game playing while he was not present.  He also testified he used Meisel's computer once, "just for a few minutes" right before Meisel's arrest, to order Frisbee golf discs.  Although he was somewhat unsure, J.H. thought Meisel was not at home when he bought the discs.  He testified he called Meisel, who gave him permission to use the computer.  He was able to use the computer without the password because the slots game was running on the computer.[18]

Meisel called Thomas's granddaughter, Morgan Stasyszen to testify.  In response to a question regarding whether she had ever observed W.R. on Meisel's computer, Stasyszen responded as follows:

> A.  No.
>
> Q.  You didn't?
>
> A.  No.
>
> Q.  Do you remember talking to our investigator, Anthony?
>
> A.  Yes.
>
> Q.  And do you remember telling him that you saw [W.R.] on the computer when he wasn't supposed to be?
>
> A.  I never seen him on it.  He, apparently—he was—[Meisel] said that he had ways that he could figure out how, uh, [W.R.] was on it when we were gone.

---

[18]Randolph testified his forensic examination confirmed that, on June 10, 2014, between 5:39 and 6:13 p.m., someone using Meisel's computer searched for "pro disc golf set" on Amazon.com.

Stasyszen also testified she had never seen anybody else on Meisel's computer and that neither she nor her brother had been allowed to use Meisel's computer without him present in the home.[19]

Nicholas Eady and Susan Musson testified for Meisel. Both testified they were familiar with Meisel because of Meisel's active volunteer efforts and thought highly of his character and work-ethic. Both conceded on cross-examination they had little knowledge of Meisel's home life and no knowledge of his computer activities.

Meisel testified on his own behalf. With regard to W.R. and the laptop, Meisel testified as follows:

> Q. And with respect to your computer, did [W.R.] have access to your computer?
>
> A. Yes.
>
> Q. And how did—what form did that take? How did you make it available to him?
>
> A. Well, the computer was always in the living room, I never put it anywhere else and, originally, I let him have the password to it.
>
> Q. And was there some time that you realized that he was using the computer without your permission?

___

[19]Anthony Scognamillo, an investigator for the defense, interviewed Stasyszen prior to her testimony. Scognamillo testified Stasyszen never stated she observed W.R. on Meisel's computer. Instead, consistent with her testimony at trial, she stated that Meisel speculated in her presence that W.R. had used his computer when he was absent from the residence.

A. Yes.

Q. And did you speak to him about it?

A. I spoke to him about using the computer but he denied it was him but I knew he was doing it.

Q. And you heard the testimony from Ms. Thomas about finding the references to child pornography sites?

A. Yes.

Q. Do you recall that incident?

A. Yes, I do.

Q. And could you describe that for the jury, how that occurred and what you remember?

A. She was up all night or something, I can't remember exactly how that came about there, but when I had got up in the morning she mentioned to me and showed them to me.

I looked at them, I tried to open a couple of them to see what they were, because I saw the titles, and they wouldn't open so I figured they were mostly deleted files so I just went ahead and deleted them. I opened one or two and there was just pictures that I deleted right away.

Q. And was [W.R.] living with you at the time or not?

A. Um . . . .

Q. As best you recall.

A. Best I can recall, I believe he was.

Q. Okay. And what action did you take after seeing those items on the—or those references on the laptop?

A. Well, most immediately was changed the password.

-22-

Q. And did you do anything with respect to the references to the child pornography on the—

A. Oh, I just deleted them.

Meisel also asserted J.H.'s use of his computer had been undertaken without permission. According to Meisel, he did not give J.H. permission to shop for golf discs. Instead, he recalled J.H. had proceeded without permission, then simply told Meisel he had done so after the fact. Meisel testified he thought he was volunteering at the food bank during this incident.

Meisel testified he had no idea how the child pornography got on the external hard drive. He said he never searched for child pornography, had no interest in child pornography, did not use Ares to obtain or share child pornography, and was just as upset about the contents of the child pornography as anyone else. Meisel testified he used the computer primarily for playing games. He explained he worked at the food bank Monday, Wednesday, and Friday mornings; met with the men's group at his church on Saturday mornings; and went to church on Sunday mornings. He testified he often left the computer on and running when he was not at home, primarily because he was running slots, gaming, or downloading a movie or music from Ares. He thus had no idea if others used his computer when he was not home. Meisel "stumbled upon" child pornography on one occasion when he downloaded what he thought was a music video, but was instead a nude girl dancing. He stated he deleted the file

-23-

immediately.  Meisel testified he bought the external hard drive at a yard sale approximately one week after he purchased the laptop.  He stated he purchased the external hard drive as a backup to the laptop computer because the hard drive of his previous computer had crashed.

On cross-examination, Meisel admitted he initially told officers he purchased the external hard drive three and a half years ago, which dates to late 2010, not September 2011.  He testified he was aware there were some folders on the external hard drive when he purchased it, but asserted he did not view their contents or delete them.  He specifically remembered the existence of a "Test" folder on the external hard drive, although he admitted he had never mentioned this fact during his lengthy interview with Detective Kleinsorge.  He also testified any confusion during his interview with Kleinsorge flowed from the fact there was a separate "Test" folder on the computer's internal hard drive and it was that "Test" folder, not the "Test" folder on the external hard drive, where W.R. supposedly stored child pornography.  Meisel admitted he had some computer training, knew how to assign a drive letter, and actually assigned the external hard drive as the H drive.  Nevertheless, Meisel asserted he had never seen the "Test" folder on the external hard drive listed as the shared file in Ares.

### 4. Jury Instructions

Prior to the close of evidence, Meisel submitted a package of jury instructions to the district court.  His proposed instruction number four provided as follows:

> The government must prove, beyond a reasonable doubt, that the offenses charged in this case were actually committed and that it was the defendant who committed them.  Thus, the identification of the defendant as the person who committed the offenses charged is a necessary and important part of the government's case.
>
> If, after examining all of the testimony and evidence in this case, you have a reasonable doubt as to the identity of the defendant as the person who committed the offenses charged, you must find the defendant not guilty.

This instruction is derived from Tenth Circuit Pattern Criminal Jury Instruction 1.29 (2011), a pattern instruction dealing with eyewitness identifications.  The district court declined to give the jury Meisel's requested "identity" instruction.

### 5. The Parties' Closing Arguments

The parties' closing arguments made clear to the jury that this case boiled down to one question: Was Meisel the person who placed child pornography on the external hard drive attached to his computer?

The government walked through the forensic evidence and argued, based on that evidence and Meisel's statements to Kleinsorge, Meisel purchased and organized the hard drive before the creation of the "Test" folder.  The government then proceeded to "talk a little bit about the identity evidence."  The government

asserted the evidence proved beyond a reasonable doubt that it was Meisel, not W.R. or anybody else, who was responsible for downloading and sharing child pornography via the "Test" folder on the external hard drive.

In his closing, Meisel asserted that from the very beginning of the investigation, officers were focused on him to the complete exclusion of other suspects. He noted this was true even though he was not home and his computer was running when officers came to execute the warrant. He also noted the person that was home when officers came to execute the warrant, J.H., "admitted to the investigators and testified [at trial], he went on the computer without logging in, without using a password, because it was running, to order golf discs off of Amazon on June 10th, 5:30 to 6:30, 2014." Meisel then specifically argued the evidence demonstrated W.R. previously placed child pornography on the computer and that, in response, he removed that child pornography immediately after Thomas brought it to his attention. Finally, Meisel reminded the jury Randolph's forensic evidence demonstrated there "were other devices, users accessing that external hard drive."

In rebuttal, the government first focused on the power of the forensic evidence as demonstrated to the jury through the virtual machine tour of Meisel's computer and external hard drive. The government then refuted Meisel's assertion investigators had focused exclusively on him, noting the evidence

demonstrated investigators had looked into J.H. as a potential suspect. Finally, the government finished by arguing as follows:

> Failed logins. Those are important. Why are they important? Because it means the computer was logged out. Think about that. If there is failed logins, it means the computer was logged out.
>
> And if it's an alternative perpetrator, somebody else, why would you need to login? Just take the external drive. If you want the child porn, just take the external drive, because you know where it is; you're the one that put it there.
>
> The context tells you there is no alternative perpetrator. It's the defendant. That argument is a rattle: It's meant to put a question out there. . . .

## 6. The Verdict

After roughly an hour and fifteen minutes of deliberation, the jury returned unanimous guilty verdicts as to both the possession and distribution counts.

## III. ANALYSIS

## A. Alternative Perpetrator Evidence

### 1. Standard of Review

Despite Meisel's assertions to the contrary, this court's precedents make clear we review a "decision to admit [or deny] alternative perpetrator evidence under an abuse of discretion standard." *United States v. Jordan*, 485 F.3d 1214, 1218 (10th Cir. 2007). Under this standard, we will reverse only if "the district court's decision is arbitrary, capricious, or whimsical, or results in a manifestly unreasonable judgment." *Id.* (quotation omitted). The district court's decision is

entitled to deference because of "its first-hand ability to view the witnesses and evidence and assess credibility and probative value." *Id.* Thus, the district court's decision here to limit, to one degree or another, alternative perpetrator evidence "will not be disturbed unless [this court] has a definite and firm conviction that the [district] court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances." *Id.* (quotation omitted); *see also id.* at 1222 (noting that even though this court might have made a different choice in the first instance, the district court did not abuse its discretion in refusing to admit alternative perpetrator evidence).

Meisel concedes the district court allowed him to present to the jury any evidence he had regarding other individuals' access, potential or actual, to his computer and external hard drive. Meisel's Reply Br. at 4. He, nevertheless, argues that having allowed him to introduce such evidence, the district court's real error was in not allowing him to utilize the term "alternative perpetrator" in presenting his case to the jury. It is this issue, he asserts, that is one of law subject to de novo review. The district court did, indeed, allow Meisel to admit any and all evidence indicating others had access to, and use of, his computer and external hard drive. The question then becomes whether that evidence, in the context of the whole trial, was sufficient to allow Meisel to argue a particular person was the person who placed the child pornography on his external hard drive. In answering that question in the negative, the district court drew on its

-28-

unique "first-hand ability to view the witnesses and evidence and assess credibility and probative value." *Jordan*, 485 F.3d at 1218. The district court determined the proffered evidence was relevant and admissible to disprove the government's assertion Meisel was guilty because, at least in part, he had exclusive use, possession, and control over the computer, but did not satisfy the nexus requirements set out by both the Supreme Court and this court for arguing either W.R., J.H., or S.H. was the actual guilty party.[20] Because the district court engaged in exactly the kind of evidentiary balancing contemplated in *Jordan*, the appropriate standard of review is abuse of discretion. *Id.* at 1222 (discussing the Supreme Court's decision in *Holmes* in addressing whether the district court abused its discretion by precluding a defendant from raising an alternative perpetrator defense).[21]

---

[20]In any event, as demonstrated by the parties' closing arguments, and borne out by the entirety of the trial transcript, it is abundantly clear the district court, the parties, and the jury fully understood Meisel was asserting J.H. and/or W.R. was responsible for the child pornography found on Meisel's external hard drive. This matter is discussed more fully below.

[21]Meisel fails to cite any support for his contention that having admitted evidence others had access to his computer, the district court was obligated to allow him to argue any inference he would like from the evidence. This is most surely because that contention is wrong. It is not remotely odd for a district court to admit evidence for a limited purpose. *See* Fed. R. Evid. 105 (recognizing district court's power to admit evidence for a limited purpose). Thus, contrary to Meisel's arguments, the district court decision at issue here, the exclusion (at least in theory) of evidence a particular person actually committed the crime with which Meisel was charged, falls neatly within the evidentiary rubric and standards set out in *Jordan*. It is for that same reason Meisel's reliance on this court's

(continued...)

## 2. Legal Standard

Because the legal framework applicable to alternative perpetrator evidence is set out at length in *Jordan*, this court need do no more than summarize the law. The Supreme Court has noted that special considerations arise when a court is faced with a defense theory of an alternative perpetrator: "Evidence tending to show the commission by another person of the crime charged may be introduced by accused when it is inconsistent with, and raises a reasonable doubt of, his own guilt; but frequently matters offered in evidence for this purpose are so remote and lack such connection with the crime that they are excluded." *Holmes*, 547 U.S. at 327 (quotation omitted); *see also id.* (holding that third-party guilt evidence may also be excluded "where it does not sufficiently connect the other person to the crime, as for example, where the evidence is speculative or remote, or does not tend to prove or disprove a material fact in issue at the defendant's trial" (quotation omitted)).  As this court explained in *McVeigh*:

---

[21](...continued)
decision in *United States v. Ortiz*, 804 F.2d 1161 (10th Cir. 1986), is unavailing. In *Ortiz*, the question before this court was whether evidence properly admitted during the government's case was sufficient to place the defense of entrapment at issue.  *Id.* at 1163-65.  *Ortiz* held this question was one of law for the court.  *Id.* at 1164 n.2.  Here, however, the district court never admitted any of Meisel's evidence for the purpose of demonstrating an alternative perpetrator committed the crime.  Instead, the district court admitted such evidence for the limited purpose of rebutting the government's assertion Meisel maintained exclusive control of the laptop computer and external hard drive.  Thus, as was the case in *Jordan*, 485 F.3d at 1218, 1221-22, the question at issue on appeal is whether the district court abused its discretion in resolving this evidentiary issue.

Although there is no doubt that a defendant has a right to attempt to establish his innocence by showing that someone else did the crime, a defendant still must show that his proffered evidence on the alleged alternative perpetrator is sufficient, on its own or in combination with other evidence in the record, to show a nexus between the crime charged and the asserted "alternative perpetrator." It is not sufficient for a defendant merely to offer up unsupported speculation that another person may have done the crime. Such speculative blaming intensifies the grave risk of jury confusion, and it invites the jury to render its findings based on emotion or prejudice.

153 F.3d at 1191 (citation omitted). Thus, a district court "may properly deny admission of alternative perpetrator evidence that fails to establish, either on its own or in combination with other evidence in the record, a non-speculative 'nexus' between the crime charged and the alleged perpetrator." *Jordan*, 485 F.3d at 1219.

### 3. Application

Because the district court allowed Meisel to introduce all available evidence regarding the use by, or proximity of, others to his computer and external hard drive, we focus on that evidence to determine whether the court abused its discretion in granting the government's in-limine motion to exclude such evidence when offered for the purpose of arguing an alternative perpetrator committed the charged crime. *Cf. id.* at 1220 (considering both proffered and admitted evidence in deciding whether the district court abused its discretion in precluding an alternative perpetrator defense).

### a. S.H.

Trial testimony reveals S.H. visited the home Meisel shared with Thomas, Thomas regularly slept during the day, and Meisel left his computer on with a slots program running. Given this extremely limited evidence, we have no doubt the district court acted within its discretion in refusing to admit the evidence for the purpose of arguing S.H. is the person who committed the child pornography crimes set out in the indictment. If mere proximity and potential access were sufficient to argue an alternative perpetrator committed the crime, this court can hardly envision a criminal trial that would not involve such a defense. *But see id.* at 1220-22 (holding the district court did not abuse its discretion in limiting alternative perpetrator evidence where the record demonstrated the supposed alternative perpetrator was near the victim no more than ten minutes before the crime).[22]

---

[22]Meisel notes his proffer asserted child pornography was found on S.H.'s cell phone. This might be meaningful if the record or proffer demonstrated any kind of connection between that child pornography and the child pornography found on Meisel's hard drive. Instead, as Meisel readily acknowledges, none of the images found on S.H.'s cell phone matched images found on Meisel's hard drive. Furthermore, there is no evidence, forensic or otherwise, demonstrating a relationship between the two sets of images (e.g., common source or thematic consistency). Thus, the proffered evidence regarding S.H.'s cell phone appears to be designed to do nothing more than trigger one of the primary concerns with alternative perpetrator evidence— such evidence "would invite the jury to blame absent, unrepresented individuals . . . for whom there often may be strong underlying emotional responses." *United States v. McVeigh*, 153 F.3d 1166, 1191-92 (10th Cir. 1998). Thus, this evidence is nothing more than prior bad acts

(continued...)

**b. W.R.**

Evidence implicating W.R. as the actual perpetrator of the crimes set out in the indictment is similarly speculative and remote. No witness testified at trial to having observed W.R. using Meisel's computer. Instead, Thomas testified that when she found child pornography on Meisel's computer, Meisel blamed W.R. Stasyszen testified that during her visits, she never observed anyone use the computer, specifically including W.R. Instead, she noted Meisel asserted W.R. was using his computer without permission. Stasyszen testified Meisel stated he had an (unexplained) way of "figur[ing] out" whether W.R. was on the computer while he was away from the home. Meisel testified W.R. had access to the computer and knew the password,[23] but did not testify he saw W.R. actually using

---

[22](...continued)
evidence. As noted above, Meisel's opening brief on appeal specifically declined to challenge the district court's exclusion of this type of evidence. *See supra* n.7.

[23]Meisel asserts his trial testimony demonstrates W.R. had "permission" to use the computer. This is not an entirely accurate assessment of the evidence. Meisel testified as follows:

> Q. And with respect to your computer, did [W.R.] have access to your computer?
>
> A. Yes.
>
> Q. And how did—what form did that take? How did you make it available to him?
>
> A. Well, the computer was always in the living room, I never put it anywhere else and, originally, I let him have the password to it.
>
> (continued...)

the computer.  Again, without explaining how, Meisel simply asserted he knew W.R. was using the computer without his permission.  Finally, the government's forensic evidence indicated an external device bearing W.R.'s name, a flash drive labeled "[W.R.'s]" was, at some point, attached to Meisel's computer.

At most, then, the evidence at trial demonstrated W.R. had used Meisel's laptop and Meisel had some, unexplained, method of determining W.R. viewed child pornography while on the computer.  This court need not determine whether this exceedingly limited evidence would be sufficient to present an alternative perpetrator defense to the jury involving W.R. because the evidence lacks any meaningful temporal link to the crimes at issue at trial.  That is, there is absolutely no evidence indicating W.R. was anywhere near Meisel's computer or external hard drive for at least one year before the events at issue.  Instead, the uncontroverted evidence reveals that approximately one year before officers initiated this investigation, Thomas asked W.R. to leave the residence.  The evidence further reveals that when, thereafter, Thomas found child pornography

<hr />

[23](...continued)
> Q.  And was there some time that you realized that he was using the computer without your permission?

> A.  Yes.

> Q.  And did you speak to him about it?

> A.  I spoke to him about using the computer but he denied it was him but I knew he was doing it.

on Meisel's computer, Meisel blamed W.R. and said he removed all child pornography from the computer at that time. The undisputed forensic evidence demonstrates the Ares program was not set to download or share files automatically, but that file sharing had to be manually initiated each time the computer was logged on. Given all this, the district court most assuredly did not abuse its discretion in determining Meisel had failed to demonstrate even the remotest nexus between W.R. and the crimes at issue in Meisel's trial. That is, absent any evidence as to how W.R.'s use of Meisel's computer over a year before the events in question could have led to the presence of child pornography on Meisel's hard drive and/or could have led to the distribution of child pornography from Meisel's computer via Ares on May 9, 2014, the jury would have to engage in "unsupported speculation" to determine W.R. was responsible for the crimes with which Meisel was charged. *McVeigh*, 153 F.3d at 1191.

### c. J.H.

Although this court has no difficulty concluding the district court did not err in excluding alternative perpetrator evidence as to S.H. and W.R., the exclusion of such evidence as to J.H. is an entirely different matter. In support of his assertion J.H. was a viable alternative perpetrator for the crimes with which Meisel was charged, Meisel adduced significant evidence of a connection (i.e. both proximity and use) between J.H. and the computer. J.H. testified he and Meisel lived together in Belle Plaine, Kansas, for up to three years before Meisel

-35-

moved into Thomas's home. Meisel bought the laptop computer during the period he cohabited with J.H. J.H. continued to have access to the computer and hard drive when Meisel moved into Thomas's home. Thomas testified J.H. was her caretaker for the entire time Meisel lived with her. In that capacity, J.H. had a key to Thomas's home and was present in the home approximately four days a week. Thomas testified Meisel was often absent from the home doing volunteer work and she often slept during the day. J.H. was present in the home during these time periods.

The evidence further reveals that Meisel occasionally left his computer running while he was absent from the home and that, when this was the case, anybody could access the computer without a password. In addition to potential access, the record contains evidence J.H. actually used Meisel's computer. The forensic evidence reveal a flash drive linked to J.H.'s name had, at some point, been plugged into the computer. J.H. accessed the computer on June 10, 2014, just a few days before the warrant was executed. Finally, the record reveals that on that same day, a day Meisel was possibly absent from the home, child pornography was downloaded onto Meisel's hard drive via Ares. That is, the government's forensic evidence indicates J.H. was on the computer shopping for "golf discs" from 5:39 p.m. to 6:13 p.m., while Ares downloads of child pornography occurred at 2:21 p.m., 2:56 p.m., 4:00 p.m., 4:31 p.m., and 6:40 p.m.

Thus, in summary, Meisel adduced evidence of J.H.'s consistent proximity to the subject computer and external hard drive, actual access of the computer on more than one occasion, and use of the computer in close temporal proximity to the download of child pornography from the computer to the external hard drive via Ares. Given all that, the assertion the district court erred in concluding Meisel failed to establish a sufficient nexus between J.H. and the crimes at issue here is not without serious persuasive force.

In ruling as it did, the district court stated two justifications. First, it stated Meisel's "allegation that because [J.H.] used the computer for a lawful purpose between two times in which the computer was used to download child pornography, it *must* also be that [J.H.] was also the person responsible for accessing and downloading the child pornography. This notion is merely 'unsupported speculation' and lacks a sufficient nexus to link [J.H.] to the crime charged." *See supra* at 11 (setting out entirety of the district court's order). As noted by Meisel, however, neither the government nor the district court has identified case law holding that alternative perpetrator evidence is admissible only if it conclusively demonstrates the guilt of the alleged alternative perpetrator. Instead, such evidence is admissible if a defendant's "proffered evidence on the alleged alternative perpetrator . . . , on its own or in combination with other evidence in the record, . . . show[s] a nexus between the crime charged and the asserted 'alternative perpetrator.'" *McVeigh*, 153 F.3d at 1191; *see also*

-37-

*Jordan*, 485 F.3d at 1222 (holding test for admissibility of alternative perpetrator evidence is *not* as onerous as the standard courts apply in determining whether evidence is sufficient to support a conviction). Second, the district court indicated "the evidence suggests that [Meisel] was present and monitoring [J.H.'s] use of the computer during this time." *See supra* at 11. The relevance of the district court's evidentiary determination about Meisel's presence during J.H.'s use of the computer is not altogether clear. There is no doubt a jury could conclude Meisel was present during J.H.'s use of the computer on June 10, 2014. Similarly, however, a jury could conclude Meisel was not present on that date at the relevant time. J.H. testified Meisel was not present and he accessed the computer only after calling Meisel to obtain the password. Meisel likewise testified he was not present, but equivocated as to that fact on cross-examination. In addressing the admissibility of alternative perpetrator evidence, however, the strength of the government's case is not generally a relevant concern. *Holmes*, 547 U.S. at 320 (noting a district court should not exclude alternative perpetrator evidence merely because the district court thinks the government's case is strong and the defendant's alternative perpetrator argument or evidence is weak); *see also Jordan*, 485 F.3d at 1222 (noting the "Supreme Court has cautioned us to be wary of per se rules excluding evidence of third-party guilt merely because the prosecution's case is strong enough" (quotation omitted)).

Ultimately, however, this court need not definitively decide whether the district court abused its discretion in refusing to admit Meisel's evidence for the purpose of arguing J.H. was the one who committed the crimes at issue because, even assuming the existence of such an error, the record demonstrates the error is harmless beyond a reasonable doubt. *United States v. Russian*, 848 F.3d 1239, 1244 (10th Cir. 2017) ("For a constitutional error to be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." (quotation omitted)).[24] In reaching this conclusion, we rely on two equally important considerations.

First, the record makes clear Meisel's alternative perpetrator theory as to J.H. (and for that matter, W.R.) was tried to the jury by acquiescence of the parties. *See Jordan*, 485 F.3d at 1222-24 (concluding any assumed error in that case was harmless because the alternate perpetrator defense was actually presented to, and considered by, the jury). As noted above, during its final pretrial hearing on the matter, the district court indicated Meisel could adduce any evidence he had indicating others had access to his computer. *See supra* at 12.

---

[24]We recognize it is highly unlikely the harmless error standard applicable to constitutional errors governs in this case. *See supra* n.21 (discussing the nature of the alleged error and concluding it is evidentiary, rather than constitutional, in nature); *Jordan*, 485 F.3d at 1222 (applying the non-constitutional harmless error standard to a district court's decision to exclude alternative perpetrator evidence). Because this court is firmly convinced the error at issue here is harmless even under the heightened harmlessness standard applicable to constitutional errors, we need not definitively resolve which standard actually applies.

Meisel took full advantage of this ruling, adducing considerable evidence, as cataloged above, regarding J.H.'s access to, and use of, his computer. At no point did the government ask the district court to instruct the jury, pursuant to Fed. R. Evid. 105, that such evidence was not admitted for the purpose of Meisel raising an alternative perpetrator defense. Indeed, Meisel was allowed to inquire as to potential failings in the government's limited investigation into whether J.H. was the person responsible for the child pornography found on Meisel's computer. During J.H.'s direct examination, he admitted that when he came to Thomas's house, whether for work or to socialize, he brought his own laptop computer. On cross-examination, J.H. testified he gave Kleinsorge permission to examine his computer and that she did not find any child pornography during that search. Then, on redirect, Meisel adduced testimony from J.H. indicating the first time Kleinsorge asked to review J.H.'s computer, no search took place because J.H. could not remember the password. When asked whether the search that did ultimately take place occurred "about a month and a half" after the initial request, J.H. indicated he could not remember the exact time frame, but admitted it was sufficiently long so as to allow him to take a "trip" in the interim. Finally, though Meisel did not use the term alternate perpetrator during his closing argument, no reasonable juror could think he was arguing anything else as to both W.R. and J.H. Indeed, the government noted as much, arguing to the jury as follows:

-40-

And if it's an alternative perpetrator, somebody else, why would you need to login? Just take the external drive. If you want the child porn, just take the external drive, because you know where it is; you're the one that put it there.

The context tells you there is no alternative perpetrator. It's the defendant. That argument is a rattle: It's meant to put a question out there. . . .

Thus, the record makes clear Meisel's theory J.H. was responsible for the child pornography found on the external hard drive was presented to, and rejected by, the jury. *See Jordan*, 485 F.3d at 1223 ("[M]uch of Jordan's alternative perpetrator theory banks on already admitted evidence . . . . Jordan[] . . . also had the opportunity to raise all the other evidence that points towards [his] innocence. . . . Accordingly, the district court's preclusion of the proffer did not prevent Jordan from offering an alternative perpetrator defense. Instead, the jury chose to disbelieve the theory." (quotations, citation, and alteration omitted)).

Second, despite Meisel's protestations to the contrary, the evidence of his guilt is overwhelming. *See United States v. Glass*, 128 F.3d 1398, 1403 (10th Cir. 1997) ("To hold an error of constitutional dimension harmless, we must conclude the properly admitted evidence of guilt is so overwhelming, and the prejudicial effect of the [purported error] is so insignificant by comparison, that it is clear beyond a reasonable doubt that the improper use of the admission was harmless error." (quotation omitted)). *But see supra* n.24 (noting this court is employing the harmlessness standard applicable to constitutional errors out of a mere

abundance of caution). Unrebutted and/or unexplained forensic evidence demonstrates Meisel's assertion he was unaware of the vast collection of child pornography stored on his external hard drive is, at the very best, implausible. The evidence demonstrated child pornography found on the external hard drive was frequently played on the Windows Media Player and on the DIVX player, a program specially installed on Meisel's laptop. This undisputed evidence rendered entirely incredible Meisel's attempt to compartmentalize the child pornography onto a portion of the external hard drive (i.e., the "Test" folder) of which he claimed to be unaware. That is, there was a consistent interaction between Meisel's computer and the child pornography on the external hard drive and Meisel did not, and could not credibly, argue he was generally unaware of the contents of the computer and its operating system and programs. Nor does the trial evidence plausibly support the defense theory that Meisel's computer was consistently left on so that others could access it, thereby accounting for the huge volume of child pornography found on the external hard drive.[25] Instead, the

---

[25]The evidence demonstrates Ares was installed on Meisel's computer on the very first day it was purchased and was consistently employed to acquire and/or distribute child pornography. The computer was frequently logged off and on, averaging about three times a day, rendering remarkably unlikely Meisel's assertion his computer was consistently running in open-access mode when he was away from home. The computer and its programs were firmly linked via the forensic evidence to the H drive, the "Test" folder, and subfolders categorized by specific content. Child pornography downloaded via Ares was consistently sorted into the "Test" folder's highly specific subfolders. Child pornography found on

(continued...)

evidence overwhelmingly proved that after Thomas found child pornography on Meisel's computer, Meisel took extraordinary efforts to limit access to his computer. For that very reason, Meisel stated during his interview that if child pornography was found on the computer, he was the responsible party. Although Meisel attempted to explain away that statement at trial with the theory he was only accepting ultimate responsibility for the computer, rather than admitting guilt, the evidence to the contrary is simply overwhelming.

Because, despite the district court's evidentiary ruling, the issue of J.H.'s potential as an alternate perpetrator was tried to the jury, and because the evidence of Meisel's guilt was overwhelming, any assumed error on the part of the district court was harmless beyond a reasonable doubt.

## B. Identity Instruction

### 1. Standard of Review

Meisel asserts he preserved for appellate review the propriety of the district court's refusal to give his requested "identity instruction." The government, on the other hand, asserts Meisel abandoned the issue when he failed to raise the

---

[25](...continued)
the hard drive was also listed in the history of programs on the computer like Windows Media Player, DIVX, and Adobe Reader. Given that the H drive was specifically assigned to the external hard drive, Meisel's assertion he lacked all familiarity with the H drive's "Test" folder is implausible. Finally, Meisel's assertion he deleted child pornography (supposedly placed there by WR) from a different "Test" folder, this one located on the computer's own hard drive, was not supported by any forensic evidence.

issue at the final jury-instruction conference the morning the case was submitted to the jury. This court need not resolve the preservation issue because Meisel is not entitled to relief even if the propriety of the district court's refusal to give the identity instruction is reviewed for abuse of discretion.

This court "review[s] instructions as a whole to determine whether they accurately informed the jury of the governing law." *United States v. Bowling*, 619 F.3d 1175, 1183 (10th Cir. 2010) (quotation omitted). "A theory of defense instruction is required only if, without the instruction, the district court's instructions were erroneous or inadequate." *Id.* (alteration and quotation omitted). "While a defendant is entitled to an instruction on his theory of defense where some evidence and the law supports the theory, such an instruction is not required if it would simply give the jury a clearer understanding of the issues." *Id.* at 1183-84 (quotation omitted). We "review a district court . . . refusal to give a requested instruction under this standard for an abuse of discretion." *Id.* at 1184.

We begin by noting Meisel did not request an identity instruction (i.e., an instruction based on this court's pattern jury instruction on eyewitness identification) for any of the reasons normally relevant to the giving of a cautionary instruction regarding eyewitness identifications. *See United States v. McGuire*, 200 F.3d 668, 676 (10th Cir. 1999) (summarizing considerations relevant to determining whether a district court abused its discretion in refusing to

instruct the jury as to "special reliability concerns with eyewitness identifications"). Instead, he asked for a modified version of that instruction to make clear his defense at trial was that someone other than himself placed the child pornography on his external hard drive and subsequently caused the distribution of that material via the Ares file-sharing program. Accordingly, Meisel's requested identity instruction was really a theory-of-defense instruction, not an instruction as to potential reliability issues regarding an eyewitness to the child pornography charges. So considered, we conclude the district court did not abuse its discretion in determining the existing instructions made clear to the jury Meisel was legally responsible for the charges only if he, personally, knowingly possessed and distributed the child pornography found on his computer.

Instruction Eleven, especially when coupled with Instructions Eighteen and Twenty-One, made clear to the jury Meisel was not criminally responsible if some other person placed the child pornography on his external hard drive and/or caused his computer to distribute that child pornography. Instruction Eleven told the jury "a defendant is presumed by law to be innocent. The Government has the burden of proving a defendant guilty beyond a reasonable doubt. . . . If . . . you think there is a real possibility that he is not guilty of that crime, you must give him the benefit of the doubt and find him not guilty of that crime." Instruction Twenty-One indicated that "only the defendant is on trial here. You are not to

return a verdict as to the guilt of any person or persons except the defendant."

Likewise, Instruction Eighteen specified as follows:

> In the situation where the object is found in a place such as a room or car occupied by more than one person, you may not infer control over the object based solely on joint occupancy. Mere control over the place in which the object is found is not sufficient to establish constructive possession. Instead, in this situation, the Government must prove some connection between the particular defendant and the object.
>
> In addition, momentary or transitory control of an object is not possession. You should not find the defendant possessed the object if he possessed it only momentarily or did not know that he possessed it.

This particular instruction, which was requested by Meisel, makes clear that the jury could not convict simply because the child pornography was found on his external hard drive. Instead, the government bore the burden of proving beyond a reasonable doubt that Meisel, not anyone else, knowingly possessed and distributed child pornography. This specification was further emphasized by Instructions Thirteen, Fourteen, and Seventeen, all of which addressed the "knowing" element associated with the crimes charged. These instructions made clear the jury could convict Meisel only if it found Meisel "knowingly" (i.e., "realized what he was doing and was aware of the nature of his conduct and did not act through ignorance, mistake, or accident") possessed and distributed child pornography. Instruction Sixteen, the instruction dealing with distribution emphasized Meisel could only be guilty of the distribution count if the

government proved beyond a reasonable doubt that Meisel "knowingly makes images available on a peer-to-peer file sharing network" and "knowingly allowed others access to his Ares Shared Folder."

Viewing the instructions as a whole, we cannot conclude the district court abused its discretion in refusing to give the jury Meisel's proposed identification instruction. Although it is certainly possible Meisel's proposed theory-of-defense instruction could have given the jury a "clearer understanding of the issues," the district court's jury instructions were not erroneous or inadequate as given. *See Bowling*, 619 F.3d at 1183-84. And although this court, if it were deciding the issue in the first instance, might well have instructed the jury consistent with Meisel's theory-of-defense instruction, the governing standard of review is a deferential one. *See Jordan*, 485 F.3d at 1218 (holding that under the abuse-of-discretion standard, this court will reverse only if "the district court's decision is arbitrary, capricious, or whimsical, or results in a manifestly unreasonable judgment" (quotation omitted)). The district court did not abuse its discretion.

## IV.  CONCLUSION

For those reasons set out above, the judgment of conviction entered by the United States District Court for the District of Kansas is hereby **AFFIRMED**.